# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 15, 2014

## STATE OF TENNESSEE v. JOSE ANTONIO HENRIQUEZ

**Appeal from the Criminal Court for Davidson County**
**No. 2007-C-2687   Steve R. Dozier, Judge**

---

**No. M2013-01040-CCA-R3-CD - Filed May 2, 2014**

---

The Defendant, Jose Antonio Henriquez, was convicted by a Davidson County Criminal Court jury of two counts of aggravated sexual battery, Class B felonies; attempted aggravated sexual battery, a Class C felony; solicitation of a minor, a Class C felony; and sexual exploitation of a minor, a Class C felony. *See* T.C.A. §§ 39-13-504 (2010) (aggravated sexual battery), 39-12-101 (2010) (criminal attempt), 39-13-528 (2006) (amended 2013) (solicitation of a minor), 39-13-529 (2006) (amended 2011, 2012, 2013) (sexual exploitation of a minor). The trial court sentenced the Defendant to concurrent terms of eleven years as a violent offender for each of the aggravated sexual battery convictions and five years as a Range I, standard offender for each of the attempted aggravated sexual battery, solicitation of a minor, and sexual exploitation of a minor convictions. On appeal, the Defendant contends that (1) his right to a speedy trial was violated and (2) a fatal variance exists between the solicitation of a minor charge and the trial proof. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Dawn Deaner, District Public Defender; Jeffrey A. Devasher (on appeal), Kristin Strangl and Richard Strong (at trial), Assistant District Public Defenders, for the appellant, Jose Antonio Henriquez.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Brian Holmgren and Sharon Reddick, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to events occurring between January 1 and June 19, 2007, and involving the Defendant and the then-ten-year-old female victim. The Defendant and the victim lived in the same household but were not related.

At the trial, the victim testified that she was born on December 5, 1997. She said she had been living in Texas for the past five years with her mother and sixteen- and eleven-year-old brothers. She said she lived in Tennessee for a year when she was in the third or fourth grade. She said that when they first came to Nashville, they lived with her mother's cousin, Marie. She said the following people lived in the house: Marie, Marie's boyfriend, the victim, the victim's mother, the victim's brothers, her mother's boyfriend, and "Honduras," which was the Defendant's nickname. She said the people who lived in the house were Marie's friends. She said that she and her brothers shared one of the three bedrooms, that she usually slept on the bed and that her brothers slept on the floor. She said that the Defendant had his own bedroom and that Marie and her boyfriend had the third bedroom. She said her mother and her mother's boyfriend slept in "the other room," referring to the living room.

Regarding the events relevant to the case, the victim testified that she thought they occurred in the summer and recalled the family's recent purchase of a pool. She said that she woke to find the Defendant next to her. She said he tried to touch her and tried to get her to touch him. She said, "He was trying to poke my private parts." She said he touched her chest first, moving his hand slowly on her breasts. She said that she was lying on her back on the bed, that the Defendant was next to her on his side, and that her brothers were asleep on the floor. She said that he touched her left breast over her clothes for thirty minutes to one hour and that she tried to cover her chest with one hand and her vagina with her other hand. She said she knew the time because she had a cell phone her mother had given her. She said that the Defendant did not speak and that she told him to leave her alone. She said that when she covered her breasts, the Defendant tried to touch her vagina and that when she covered her vagina, he tried to touch her breasts. She said the Defendant pulled her wrist with both of his hands and tried to get her to touch his private area. She said he took his penis from his boxer shorts and exposed it to her. She said she pulled her hand away. She said he tried to get her to touch his penis more than once. She said the Defendant rubbed her vagina with his finger over her clothes. She did not know if he used more than one finger. She said the bedroom light was off. She said that she did not move to her side or roll over, that she got up to go to the bathroom, and that she cried. She was unaware of the Defendant's ever sleeping in her bedroom before that evening.

-2-

The victim testified that she was scared when she went into the bathroom. She said the Defendant tried to open the bathroom door, knocked, and asked her to come out. She said that when she left the bathroom, she thought he was gone because she heard the door to another room open. She said the touching continued after she left the bathroom, but she later said all the touching took place before she went to the bathroom. She did not know how long she was in the bathroom. She said that when she returned to her bedroom, she lay close to her brothers because she saw the Defendant on the bed. She said she did not go back to the bathroom because she was tired and wanted to sleep. She said the Defendant offered her $10 to allow him to touch her, which she described as his wanting to "stick" his penis in her vagina. She said he asked to touch her more than three times. She said that he showed her some money but that she could not see it in the dark. She said he put $1 in her hands and told her to keep it. She said she kicked her older brother and whispered to her brothers. She said one of her brothers sat up, wiped his eyes, and lay down. She did not know how long the Defendant stayed in the bedroom after she returned and said she was anxious for him to leave. She said the Defendant rubbed his penis when he was on the bed before and after she went to the bathroom. She said he told her not to tell anyone about the events.

The victim testified that she did not say anything to her mother the next day because she was scared. She said, though, her mother found the Defendant in her bedroom the next night. She said she slept on the floor close to her brothers that night because she was scared. She said that she was asleep when her mother entered the room but that she knew her mother came in the room because her mother asked her if anything was wrong the next day. She said she began crying and told her mother what happened. She said her mother told Marie. She said that they went to a pay phone because there was no telephone in the house and that the Defendant was gone when they returned. She said that a police officer came to the house but that the police could not find the Defendant.

The victim testified that she talked to a woman about the events but did not recall if the interview was recorded. She said she talked to a police officer and thought the officer was female. She identified the Defendant in court by pointing, although the record does not reflect the identity of the person to whom she pointed. She said she had not seen the Defendant since the events she described.

On cross-examination, the victim testified that she did not know how long she lived in the house before the Defendant touched her. She said that the room she shared with her brothers was the largest room in the house and that she could not reach out to touch them from the bed. She drew a diagram of the house, which was shown to the jury. She said that she kicked, pinched, and pushed her older brother after she returned from the bathroom on the night the Defendant touched her but that she could not wake him. She said she did not try to get her brothers' attention before she went to the bathroom. She said she was too

-3-

scared to try to go into the living room where her mother and her mother's boyfriend were asleep. She acknowledged she did not try to go to Marie's room. She said that when she was in the bathroom, she "tried" to beat on the door but did not want to beat too hard because the television in the living room might fall and break. She said that when she returned from the bathroom, she lay down near her older brother and that the Defendant scooted to the edge of the bed. She said he was able to reach her and tried to touch her breasts with both hands. She said that she covered herself, that he continued to try to touch her, and that he tried to "bribe" her with money. She said the Defendant wore only boxer shorts and acknowledged he did not have a pocket for money. She said he left the room after offering her money and her refusal for him to touch her. She said that although she told him she did not want the money, he put it in her hand and left the room. She said that although he told her not to tell anyone, he did not threaten her.

Regarding the following night, the victim testified that she woke to get some water but that she did not wake when the Defendant was in the room. She said her mother told her he had been there.

The victim's mother testified that she had lived in Texas since 2008. She said that before moving to Texas, she lived in Nashville with her cousin, her cousin's boyfriend, her boyfriend, and the Defendant. She identified her cousin as Marcela Arevell. She said her children were not in school at the time because the events occurred in the summer. She said Ms. Aravell's boyfriend's name was "Luiz." She said that her cousin and Luiz had a construction business and that Luiz was responsible for hiring others. She identified her boyfriend as Luiz Palacios. She said the Defendant's nickname was Honduras, which she said referred to his national origin. She said the Defendant was already living at her cousin's house when she moved in. She said the Defendant worked odd jobs and did construction work through her cousin and her cousin's boyfriend.

The victim's mother testified that she and her boyfriend slept in the living room and that her children shared a bedroom. She said that her cousin and her cousin's boyfriend shared the master bedroom and that the Defendant had a bedroom.

The victim's mother testified that she never observed any interactions between the Defendant and the victim that concerned her and was unaware of any conflicts between them. She said the Defendant played outside with the children. She never saw any physical interaction between the victim and the Defendant until the events involved in the case.

The victim's mother testified that one night after 11:00, she and her boyfriend were asleep in the living room. She saw the Defendant come out of his room and enter the bathroom. She saw the light turn off but did not see him return to his room. She waited a

-4-

few minutes, thinking he was still in the bathroom. She said that three or four minutes after the light went out, she went to her children's room and found the Defendant in bed with the victim. She said that the victim lay on her back and the Defendant was on his side next to the victim. She saw the Defendant's right hand reaching toward the victim's breast. She said she asked the Defendant what he was doing and what was "really going on." She said he looked dazed, stood up, and said, "[T]his is not my room?" She said he left and went to his bedroom. She did not talk to the victim at this point.

The victim's mother testified that she tried to wake her cousin because she wanted to use her cousin's cell phone, but her cousin did not wake. She said she tried to wake her boyfriend to take her to a pay phone, but he did not wake. She said her boyfriend's cell phone had been "cut off."

The victim's mother testified that she spoke to the victim the next morning. She told the victim that what happened was not right and asked whether it had happened previously. She said the victim was quiet and cried. She said the victim stated that the Defendant had been in her room the night before the victim's mother found him there. She did not know the date but thought it was in June. She said the victim stated that she was afraid and did not tell her mother. She said the victim stated that the Defendant touched her breast and tried to touch her vagina. She said the Defendant left the house before she talked to the victim.

The victim's mother testified that after she talked to the victim, she told her cousin about the situation. She said that her boyfriend had already gone to work but that she called the police after her boyfriend returned and drove her to a pay phone. She said the Defendant was home when she left to call the police. She did not talk to the Defendant. She said that her boyfriend wanted to confront the Defendant but that her cousin and her cousin's boyfriend would not allow it.

The victim's mother testified that the police met her and followed her home. She said that the Defendant was no longer at the house and that he never returned. She said she was told that he had been taken to some apartments off Murfreesboro Road. She said that a female officer talked to the victim and her and that the officer gave her information about talking to someone at the Child Advocacy Center. She said that she took the victim to the center within seventy-two hours but that she was not present when the victim was interviewed.

The victim's mother testified that she provided Detective Dorsam with information about where she thought the Defendant was staying, which was based on information from others. She said that Detective Dorsam told her that every time he went to a location she identified, the Defendant had already moved.

The victim's mother testified that she had not had any conflicts with the Defendant before she contacted the police. She was unaware of her children or boyfriend having conflicts with him and said her boyfriend and the Defendant had been friends for many years.

On cross-examination, the victim's mother testified that her children's room had two twin beds. She said that the victim slept in one, that her sons slept in the other, and that the beds were on opposite sides of the room.

The victim's mother testified that her daughter was "under the covers" and that the Defendant was on top of the covers. She said his hand rested on top of the victim's breasts. She said that she turned on the lights and that the Defendant acted dazed. She said her sons woke. She said that she turned around and knocked on her cousin's door but that her cousin did not answer. She said she was very concerned about what happened. She tried unsuccessfully to wake her boyfriend. She said she did not know what else to do. She said she had moved from Texas two months earlier and did not know where to find a pay phone. She agreed her cousin had a cell phone.

The victim's mother testified that her cousin was at home but not in the room when she talked to the victim the next day. She said she asked to use her cousin's cell phone, but her cousin refused. She did not say when she asked to use her cousin's cell phone. She said her cousin told her that they had been "molested" when they were children and "turned out fine." She agreed that her cousin still lived in Nashville but that she was not present in court. She agreed her cousin's refusal for her to use the cell phone was why she had to wait to call the police at the pay phone. She thought her cousin and her cousin's boyfriend took the Defendant to another location when she left the house to call the police. She said that she asked her cousin why they took the Defendant away and that her cousin said, "I don't think he did it." She said she left Texas because her husband physically abused her older son. On redirect examination, she said she never saw the Defendant have an overnight guest at her cousin's house.

Metro Nashville Police Sergeant Bonita Blue-Washington testified that on the evening of June 19, 2007, she responded to a dispatch call and went to the house where the victim lived. She agreed the victim provided information about a person touching her breasts and genitals and exposing his penis to her beginning on June 17, 2007. She said no one from the sex crimes unit responded that night. She said the person whom the victim identified as the perpetrator was not at the house. She said the victim's mother identified the residents as herself, her children, "a gentleman," and "her husband . . . [o]r the children's father at that time."

-6-

Sergeant Blue-Washington testified that she learned from the victim's mother about another incident in which the perpetrator was in the victim's bedroom. She said the date of the second incident was June 18, 2007. She said the house where the victim lived was two and one-half to three and one-half miles from Murfreesboro Road.

On cross-examination, Sergeant Blue-Washington testified that she received the call to go to the victim's house around 10:00 p.m. She agreed that she believed the only people living at the house were the victim's mother, the children, and the husband or father. On redirect examination, she said that there were other people in the house and outside but that she did not ask their relationship to the victim's family.

Former Metro Nashville Police Detective Brian Dorsam testified that he was assigned to investigate the victim's allegations. He was not present for her June 26, 2007 forensic interview at the Child Advocacy Center but received video and written records. He said he went to the victim's house and spoke with her mother. He said the alleged perpetrator was not at the house. He did not recall if the victim was present but said he would not have interviewed the victim's mother in the victim's presence.

Mr. Dorsam testified that he received information about the Defendant's possible whereabouts. He thought he received the information from the victim's mother. He said he went to the locations. He said that shortly after the allegations arose, he found the Defendant at an address on Murfreesboro Road. He said he went to the address with Officer Carlos Angulo, a Spanish-speaking officer. He said the Defendant opened the door. He said he asked through Officer Angulo for "Mr. Henriquez." He said that they were told Mr. Henriquez did not live there and that the person who answered the door identified himself as Benjamin Orilana. He said the Defendant identified himself as Jose Antonio Henriquez after Mr. Dorsam confronted him with some information. He said the Defendant provided a cell phone number that matched the number Mr. Dorsam had received previously from the victim's mother. He said that before the Defendant accurately identified himself, they checked the identification of everyone else at the apartment. He said the Defendant was the only person without identification. He said he would have told the Defendant he was following up on allegations but would not have said he was investigating child sexual abuse. He said that he tried to question the Defendant but that the Defendant did not want to talk. He said he attempted to locate the Defendant after that day but was unsuccessful.

On cross-examination, Mr. Dorsam testified that he did not speak Spanish. He agreed multiple Hispanic males were in the apartment and said they were able to identify everyone. He said he did not have a photograph of "Honduras" but knew his cell phone number. He did not recall the officers' calling the number while they were at the apartment. He did not recall whether the Defendant wrote down his cell phone number. He said the victim's

mother gave him a cell phone bill with the number and the Defendant's name. He did not recall showing a photograph of the Defendant to the victim and her mother.

Mr. Dorsam testified that he searched unsuccessfully for the Defendant several times after the encounter at the apartment. He said he spoke to an apartment manager and showed him a photograph of the Defendant. He agreed the victim's mother gave him multiple addresses for the Defendant. When asked if there was activity on the case after August 6, 2007, he said, "I followed up on this case until December." He said that although his report documented his going to the apartment twice, he went to the complex other times. On redirect examination, he identified two of the Defendant's cell phone bills he received from the victim's mother. He agreed he received a Radio Shack receipt with the same cell phone number listed.

An assistant district attorney general stated that for Count 1, aggravated sexual battery, the State relied upon the evidence that the Defendant fondled the victim's breasts in the bedroom. He stated that for Count 2, aggravated sexual battery, the State relied upon the evidence that the Defendant fondled the victim's genitals in the bedroom. He stated that for Count 3, attempted aggravated sexual battery, the State relied upon the evidence that the Defendant attempted to have the victim fondle his penis in the bedroom. He stated that for Count 4, solicitation of a minor, the State relied upon the evidence that the Defendant offered money to the victim to engage in "sexual activity." He stated that for Count 5, sexual exploitation of a minor, the State relied upon the evidence that the Defendant exposed his penis to the victim and masturbated in the bedroom.

The Defendant testified through an interpreter that he had lived in Nashville since 2007. He said that when the police came to his apartment, he was taking a bath and that his roommate gave them the name that was previously identified as the false name he gave. He said he gave the officers his true name when he left the bathroom. When asked about his 2007 conviction for "giving the police a false name," he said that he pleaded guilty on the advice of counsel because it was not a serious crime and that he was released three days later.

The Defendant testified that he did not fondle the victim's breasts. He denied ever living with "those people" but then said, "[T]hey had just been there with us a short time." When asked if he fondled the victim's genitals, he said, "Not that I know of, no." He denied offering the victim money to engage in sexual activity or masturbating in front of her.

On cross-examination, the Defendant testified that he did not have any problems with the victim, her mother, her mother's boyfriend, or her brothers and that he "never had any trouble with anybody." He said the victim's claim was a lie. When asked if he was in the victim's room on June 18, 2007, he responded, "Your Honor, I didn't rent any room there.

I wasn't renting any room." He said he did not know why the victim accused him and said she and her family were "visitors." When asked if the victim's mother found him in the victim's bed with his arm over the victim and his hand by her chest, he said, "Well, I don't know why they're admitting this because I never made a mistake like that." He said the victim's mother's account of finding him in the victim's bedroom was "made up" and a lie. He said that if he were guilty, he would have gone back to his country after his first release from jail. He said that since he arrived, he had always lived in the Thompson Lane and Murfreesboro Road area.

When asked why the victim's mother would fabricate accusations against him, he said the victim's mother said something about having a friend in Texas who "was supposedly [his] girlfriend," although he did not know the person to whom she referred. Regarding his previous answer "not that I know of" when asked if he fondled the victim's genitals, he explained, "Well, to me it means the same. I mean, I don't know how to say it." He said he had been in the area working since his initial encounter with the police in 2007. He said that when he was released, he was told "some kind of accusation had come up" and that had he known "some big problem [l]ike this was going to come up, if I had done that, when I got out of here, don't you think I would have gone and hidden myself or I would have left here? I wouldn't have came [sic] back here or stayed here." He said Ms. Arevell told him about the allegations. He said she told him that he was not that kind of person and that to avoid the problem, he should live elsewhere while the victim and her family were visiting. He said he would not have left if Ms. Arevell had not asked.

The Defendant denied giving a false name to the police. He said he was "just a Hispanic" to the officer who came to the apartment. He denied going into the victim's bedroom. He repeated that it was a lie that he touched the victim.

After the jury found the Defendant guilty of the charged offenses, the court imposed an effective eleven-year sentence. This appeal followed.

**I**

The Defendant contends that the trial court erred in denying his motion to dismiss because he was denied his right to a speedy trial. The State contends that the trial court did not err in denying the motion. We agree with the State.

Upon the State's initiation of criminal proceedings, the right to a speedy trial is protected under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. This right is statutory, as well, in Tennessee. T.C.A. § 40-14-101 (2006). In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court devised

a balancing test to determine whether a defendant's right to speedy trial was violated and identified four factors for consideration: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right to speedy trial; and (4) the prejudice to the defendant. *Id.* at 530. In *State v. Bishop*, 493 S.W.2d 81 (Tenn. 1973), the Tennessee Supreme Court implicitly adopted the *Barker* balancing test for our state's constitutional and statutory right to a speedy trial.

At a pretrial hearing, former Detective Dorsam testified that when he went to the apartment where the Defendant was believed to be living on August 1, 2007, he checked the identification of three Hispanic males other than the Defendant and that the Defendant gave him a false name. He said, though, he identified the Defendant using the Defendant's cell phone number. He said he told the Defendant he wanted to question him about child sexual abuse allegations that arose at a house where the Defendant had lived. He said that the Defendant agreed to be interviewed at the Criminal Justice Center and that he told the Defendant he would be charged with criminal impersonation. He said that he told the Defendant the allegations and that the Defendant said he did not want to speak without an attorney present. He said the Defendant was arrested for criminal impersonation.

Mr. Dorsam testified that on August 3, 2007, he prepared warrants based on the child sexual abuse allegations because he thought the Defendant would flee. Explaining his decision to obtain the warrants immediately, he noted the Defendant's leaving Ms. Arevell's house when he was confronted by the victim's mother and the victim's mother's boyfriend and the Defendant's deception about his identity. He said the warrants were not served on the Defendant because the Defendant was released from jail about one hour before he obtained the warrants. He went to the apartment at 1199 Murfreesboro Pike where he found the Defendant on August 1, but "[t]here was no response." He did not know whether the Defendant leased the property or stayed with others who leased it.

Mr. Dorsam testified that he did not know how many times he tried to find the Defendant in order to serve the warrants. He said the victim's mother updated him regularly with information she received about the Defendant's whereabouts. He spoke with the property manager and showed him a photograph of the Defendant. He spoke with a maintenance worker. He said he drove through the complex numerous times looking for the Defendant standing outside, which the victim's mother told him the Defendant liked to do. He did this for "a while" after the indictment was returned on October 4, 2007, but did not know the number of times. He said he put information in the National Crime Information Center database and "flushed information out" to patrol officers who worked in the area and to the Warrants and Fugitive Section. He said he received information on October 30 from the victim's mother that the Defendant was staying at an apartment complex on Patricia Drive, which was a few miles from the 1199 Murfreesboro Pike apartment. He said he kept

his file open until December 2007. He said he thought the Defendant had left the area and was using a false identity. He said the victim's mother did not know in which building the Defendant was staying. He said he frequented the complex looking for the Defendant. He did not recall receiving any information about the Defendant's employment location.

Mr. Dorsam testified that he learned the Defendant was arrested on July 1, 2001, but we note that the trial court's order denying the motion to dismiss reflects the arrest date as July 1, 2011. He said that at the time of the arrest, an officer approached the Defendant and determined that outstanding capiases existed. The arrest was made at Murfreesboro Road and Thompson Lane, the area "where all of this transpired."

On cross-examination, Mr. Dorsam testified that he did not think he attempted to speak with or show a photograph to the property manager of the Patricia Drive property. He was unaware the victim's mother's boyfriend employed the Defendant after the allegations were made. We note the trial evidence that the Defendant worked for Ms. Arevell's boyfriend, not the victim's mother's boyfriend.

The Defendant testified that since October 2007 and until his arrest, he lived with a family at Thompson Lane and Murfreesboro Road. He said he lived for about a year in an apartment and moved to a house on Patricia Drive, where he lived for about three years. He said he had lived in Nashville continuously since 2007. He said that when he needed work, he went to a Mapco gas station nearby to look for a contractor.

The Defendant testified that he had two police encounters between late 2007 and his arrest in 2011. He said that the police asked him for identification when he was at Mapco two and one-half to three years earlier, that he provided the officer with identification from his country, that the officer used a small computer, and that the officer returned the identification. He said that about seven months later, he was in a car that was stopped by the police. He said he provided his identification to an officer.

The Defendant testified that his identification listed his name as Jose Antonio Henriquez and that he never had another name. He agreed that Ms. Arevell's boyfriend "Luis" was deported after they were stopped. He thought "the lady" went back to Mexico after her "husband" was deported.

On cross-examination, the Defendant testified that he did not remember Mr. Dorsam coming to his house. He agreed he was arrested for criminal impersonation but said he gave the officer his real name. He said he showed the officer a paper with his brother's name, Jose Benjamin Amin Henriquez, but "right away" told the officer his name. When asked if he told an officer his name was Benjamin Orellana, he said Orellana was his brother's and his

-11-

"other" last name.  He said his complete name was Jose Antonio Henriquez Orellana.  He acknowledged telling the officer his name was Benjamin Orellana but maintained he told the officer his complete name.  He said Benjamin Orellana was not his name.  He said his identification card from Honduras was stolen in a robbery over a year ago.  He said he went to the Hispanic Community Center and obtained another identification card.  He said his Honduran identification card listed his full name as Jose Antonio Henriquez Orellana.  He said Orellana was his mother's maiden name. He said his full name, Jose Antonio Henriquez Orellana, appeared on the Honduran identification card. He said his Honduran identification card was the only identification he carried.

Regarding the incident in which his identification was checked at Mapco, the Defendant testified that the officer asked for identification from about six people and that "practically all" of them provided it.  He said the officer took his identification to a car.

The Defendant testified that he did not remember the name of the street he lived on before he was jailed.  He said that he paid rent to the family and that the lease was in their name.  He acknowledged that he did not have a Social Security number or a utilities account in his name and that he did not pay taxes.

The Defendant testified that when an officer came to his house in August 2007, the officer did not tell him anything about alleged sexual abuse of a girl at a house where he used to live.  He described the location of the apartment in which he lived before he was arrested for providing a false name.  He denied ever living with the victim and her mother.  He said he lived with Luis, who was deported, and Luis's wife, "Maricella."  When asked if he lived with a girl who was about nine years old, he said, "I came over there to visit.  I came over there some but I didn't really ever live there."  He said he did not know if he was accused of misconduct involving a female child at the house.  He said he did not know the alleged victim.

The first prong of the *Barker* inquiry is the length of the delay.  In the present case, the Defendant was indicted on September 21, 2007, arrested on July 1, 2011, and tried on November 27, 2012.  A delay which approaches one year is sufficient to trigger further inquiry.  *Doggett v. United States*, 505 U.S. 647, 652 (1992); *State v. Utley*, 956 S.W.2d 489, 494 (Tenn. 1997).  The length of the delay in the Defendant's case is sufficient to evaluate the remaining *Barker* factors.  We note that this delay under the circumstances does not, alone, weigh heavily against the State.  *See State v. Wood*, 92 S.W.2d 341 (Tenn. 1996) (concluding a thirteen-year delay was not excessive).  Mr. Dorsam made repeated efforts to find the Defendant and maintained communication with the victim's mother to receive updated information about the Defendant's whereabouts.  Eventually, Mr. Dorsam decided that the Defendant had left the area and was using a false name.  The Defendant's Honduran

identification showed a different name than the indictment. He did not have utilities or a lease in his name, and he did not have a Social Security number.

With regard to the second *Barker* factor, reasons for the delay fall into to one of four categories. A delay can be "intentional . . . to gain a tactical advantage over the defense or delay designed to harass the defendant." *Wood*, 924 S.W.2d at 346. An intentional delay is weighted heavily in favor of the Defendant. *Id*. at 347. A delay can be the result of "bureaucratic indifference or negligence" and is weighed in favor of the Defendant. *Id.* at 346-47. Delays in proceeding to trial can also be "necessary to the fair and effective prosecution of the case," and if so, the delay is "justifiable and is not weighed against either party." *Id.* at 347. A delay can be "caused, or acquiesced in, by the defense," and such a delay is weighed against the Defendant. *Id.*; *Eric B. Blakemore v. State*, W2004-01578-CCA-R3-PC (Tenn. Crim. App. September 12, 2005), *perm. app. denied* (Tenn. Jan. 30, 2006).

The Defendant argues that the delay in this case is attributable to bureaucratic indifference or negligence and that no evidence shows that the delay falls into one of the other categories. The Defendant argues that the State failed to present any justification for the delay. He argues that Mr. Dorsam made "barely minimal" efforts to find him, that no proof exists showing the warrants and fugitive divisions tried to find him, and that the police failed to identify him during two post-indictment encounters.

Mr. Dorsam testified about his efforts to find the Defendant, going to locations the Defendant lived and frequented. He showed a photograph to an apartment manager, and he talked to a maintenance worker. He maintained contact with the victim's mother and followed up on information she provided about the Defendant's whereabouts. He put information into the police department's computerized database and gave information to the patrol officers in the area the Defendant was known to frequent. After several months of searching, Mr. Dorsam closed his file in December 2007 because he thought the Defendant had left the area and was using a false identity.

The Defendant testified about two police encounters after the indictment was returned. He said he provided an identification card with the name Jose Antonio Henriquez Orellana on both occasions. The indictment lists the name Jose Antonio Henriquez. In its order denying the motion to dismiss, the trial court found, "The defendant . . . contends that he should have been served with the indictment when he was stopped by police officers on two separate occasions. The problem with this contention is that the defendant admittedly had a different last name on his ID than the name he was indicted under in this case." We

likewise note that ultimately, the Defendant was apprehended after his identification was checked by a police officer and outstanding charges were discovered. Although the Defendant testified that he lived in Nashville continuously, no available means of tracking him through lease, utility, or tax records existed. Mr. Dorsam knew the Defendant's cell phone number, but the record reflects that the victim's mother gave the Defendant's past cell phone bills to Mr. Dorsam and that if the past bills contained an address, it would no longer be current. In the absence of any apparent means to track the Defendant and in light of Mr. Dorsam's belief the Defendant had moved and was using a false identity, we conclude that the record does not support a conclusion that the delay was due to bureaucratic indifference or negligence. This factor does not weigh against the State.

The third factor is the Defendant's assertion of his right to a speedy trial. The record reflects that the Defendant filed a motion to dismiss on October 5, 2011, three months after his arrest. The Defendant promptly asserted his speedy trial right, and this factor weighs in his favor.

The final consideration is the prejudice to the Defendant due to the delay. The Defendant contends that people he knew in Nashville since 2007 have been deported. He identifies Luis or Luiz, who lived with the victim's mother, but he has not specifically identified or described any other individuals. The Defendant did not testify or offer other evidence about these individuals' relevance to the proceedings, and he has not identified any relevant information they might have provided. We acknowledge that proving prejudice from a delay is inherently difficult and that a defendant is not necessarily required to prove affirmatively that he has suffered particular prejudice. *See Doggett*, 505 U.S. at 657 ("[W]e generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.); *Wood*, 924 S.W.2d at 348. We note in this case that the Defendant has not identified any witnesses other than a resident of the house where the incidents occurred and that the evidence shows that Luis or Luiz would have been asleep at the time of the incidents. We conclude that the Defendant has not established a speedy trial violation. He is not entitled to relief on this basis.

## II

The Defendant contends that a fatal variance exists between the allegations in the indictment and the proof relative to Count 4, solicitation of a minor. The State contends that no fatal variance exists. We agree with the State.

A variance between the information in the indictment and the evidence presented at the trial is fatal in Tennessee only if the variance is "material" and "prejudicial" to the defendant. *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). "Material" means that an essential element of the charge is lacking, such that the allegations and proof do not substantially correspond. *See id.* "Prejudicial" means a substantial right has been affected: either the defendant was misled at the trial and could not prepare a defense or is exposed to a risk of double jeopardy. *Id.* As our supreme court stated, a variance is not material or prejudicial when "the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Id.*

At the time of the offense, Tennessee Code Annotated section 39-13-528 provided in pertinent part:

> (a) It is an offense for a person eighteen (18) years of age or older . . . to intentionally command, request, hire, persuade, invite or attempt to induce a person who the person making the solicitation knows, or should know, is less than eighteen (18) years of age . . . to engage in conduct that, if completed, would constitute a violation by the soliciting adult of one (1) or more of the following offenses:
>
> (1) Rape of a child, pursuant to § 39-13-522;
>
> . . .
>
> (4) Aggravated sexual battery, pursuant to § 39-13-504[.]

The indictment charged that the Defendant:

> unlawfully, being a person of eighteen (18) years of age or older, by means of oral communication directly and intentionally command[ed], request[ed], hire[d], persuade[d], invite[d] or attempt[ed] to induce a person who the person making the solicitation knows or should know is less than eighteen (18) years of age, to engage in conduct that if completed would constitute a violation by the soliciting adult of Aggravated Sexual Battery[.]

As relevant here, aggravated sexual battery is unlawful sexual contact with a victim less than thirteen years old. T.C.A. § 39-13-504(a)(4) (2010). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, if that touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6) (2010) (amended 2013).

The Defendant contends that despite the indictment's allegation of aggravated sexual battery, the proof showed that the conduct he solicited would constitute rape of a child. *See id.* § 39-13-522 (Supp. 2007) (amended 2011) (requiring unlawful sexual penetration between a defendant and a child more than three but less than thirteen years of age). He cites the victim's testimony that the Defendant offered her money and wanted to put his penis in her vagina.

We note the following regarding the State's election of the offense. At the close of the State's proof, an assistant district attorney general stated:

> Count 4 of the indictment alleges an act of solicitation of a minor involving [the victim], date of birth, December 5, 1997, and refers to the following conduct:
>
> > The defendant offered money to [the victim] to engage in sexual activity with her in the bedroom of a residence in Nashville.

In his closing argument, the prosecutor argued that the offense was shown by proof the Defendant offered or requested the victim engage in "sexual contact" with him. At the close of the proof, the trial court instructed the jury regarding a finding of guilt for Count 4 that it must find the Defendant offered or requested that the victim engage in "sexual contact" with him. We note that the Defendant did not raise an objection to the State's election as constituting a variance from the offense charged in the indictment.

We consider, as well, whether evidence exists from which the jury could find that the Defendant solicited the sexual contact required for aggravated sexual battery. The victim's testimony is instructive:

-16-

Q. What does Mr. Hondruas do after you come in and lay down next to your brothers?

A. He asked me if I would let him touch me and he would give me $10.

Q. So Mr. Honduras offers you $10 to let you be touched by him?

A. Yes.

Q. Did Mr. Honduras show you any money?

A. He showed me money but I couldn't see it because it was dark.

Q. Did Mr. Honduras give you any money?

A. He gave me a dollar.

Q. And what did he do with this dollar?

A. He just gave it to me in my hands and he told me to keep it.

Q. Did Mr. Honduras say how he wanted to touch you at that point in time?

A. He said that he wanted to stick it in –

Q. He wanted –

A. – My vagina.

Q. He wanted to stick it in?

-17-

A. Yes.

Q. What did you say to Mr. Honduras when he offered you money and asked you that?

A. I told him no and to leave me alone because I was tired.

Q. Where were you laying at that point in time?

A. I was laying in front of my older brother.

Q. When you came back into the bedroom from going to the bathroom were your brothers still asleep at that point?

A. Yes.

Q. Did you do anything at that point in time to try to waken your brothers?

A. Yes. I had kicked my older brother but he turned around and I was whispering to my brothers. And I pinched my older brother but all he did was turn around and lay toward my little brother and didn't even notice.

. . .

Q. How long did Mr. Honduras stay in your bedroom after you came back from the bathroom?

A. I don't know.

Q. Was it a longer or a shorter period of time from the time that he was in your bedroom before you went to the bathroom?

-18-

A. It was longer.

Q. And how many different times does Mr. Honduras ask to touch you in exchange for the money?

A. More than three times.

Q. More than three times. Do you see Mr. Honduras doing anything else while he's in the bedroom that night?

A. He was touching himself.

Q. What do you mean by that?

A. He was like rubbing on his penis.

. . .

Q. While you're laying next to your brothers, does Mr. Honduras try to touch you [any more] at that point in time?

A. He tried to touch me but I covered myself. I was like covering myself up.

Q. And how were you covering yourself at that point?

A. I had one hand in – like on my chest and the other hand covering my vagina.

Q. Okay. One hand covering your chest; one hand covering your vagina?

A. Yes.

Q. Did all of the actual touching take place while you were still lying on the bed before you went to the bathroom?

A. Yes.

The evidence shows that the Defendant offered the victim $10 to engage in sexual penetration. He tried to show her the money in the dark and placed $1 in her hands. He attempted unsuccessfully to "touch" her more than three times while she shielded her breasts and genitals with her hands. The proof shows that the Defendant solicited the victim for rape of a child. If completed, this would necessarily include aggravated sexual battery under the facts of the case. There was no variance between the indictment and the proof. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-20-